DREW, J.
11 The mother appeals a judgment vacating custody of her daughter, H.M., from the State to H.M.’s father. We affirm.
FACTS
On May 9, 2008,[1] five-year-old H.M. was removed from her mother’s custody and placed in the custody of the State of Louisiana, Department of Social Services (“DSS”), after she reported that Raymond Ray, a male friend of her mother, had touched her genitals with his hand.[2] A medical examination on May 8 had revealed vaginal sex abuse and possible anal sexual abuse. H.M. was placed in the home of the Tuckers, neighbors who had raised H.M. for most of her life. H.M.’s parents were never married, and she never formally lived -with her father.
A Family Team Conference was held on June 10, and a case plan was created. The goal of the case plan was reunification. The mother’s goals under the case plan were: (i) gaining a better understanding of the alleged sexual abuse and its effects on H.M.; (ii) promoting an emotionally safe, stable environment for herself and H.M.; (iii) cooperating with the Office of Community Services (“OCS”); (iv) having a permanent plan for H.M.; and (v) maintaining a family bond.
H.M. was adjudicated a child in need of care on July 21. It was ordered that custody would continue with OCS. A disposition hearing was held on August 18. The placement with the Tuckers was continued, and the |2matter was set for a case review hearing on November 3. The case plan was approved at the disposition hearing.
On October 20, OCS provided a written report to the court which recommended that custody of H.M. be vacated to her father. It was noted that the father had complied with the case plan, but that the mother had not. CASA wrote to the court on October 30 that its recommendation was that guardianship be granted to the Tuckers.
At the November 3 hearing, the court vacated custody with DSS and returned custody to the father. The mother has appealed.
*412 DISCUSSION
The mother argues on appeal that the trial court erred in: (i) allowing OCS to seek modification of the case plan goal of reunification without prior notice and a motion for a contradictory hearing; and (ii) adopting the permanent case plan goal of guardianship without requiring OCS to seek a judicial determination that reunification efforts were not required.
Vacating custody with DSS and returning custody to the father was a permanent placement. La. Ch. C. art. 603(20) defines “permanent placement” as including the return of the legal custody of a child to his or her parent. After the court ruled in DSS’s favor, a dispositional review/permanency hearing that had been fixed for May 4, 2009, was upset.
Regarding the permanency hearing, La. Ch. C. art. 702 provides, in part:
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
| s(l) Return the child to the legal custody of the parents within a specified time period consistent with the child’s age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
[[Image here]]
E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child’s placement in an alternative safe and permanent home in accordance with the child’s permanent plan. The child’s health and safety will be the paramount concern in the court’s determination of the permanent plan.
To reverse a trial court’s permanency plan determination, an appellate court must find from the record that the trial court’s finding is clearly wrong or manifestly erroneous. State in the Interest of J.B., 35,486 (LaApp. 2d Cir.2/27/2002), 811 So.2d 179.
The mother did not comply with her entire case plan.[3] She did not attend parenting classes,[4] and she failed to take full advantage of her weekly visits with her daughter. From June 10 to October 14, the mother cancelled or did not show for over half of her scheduled visits with H.M. The CASA report noted that its caseworker observed during the visits that the mother was initially excited to see H.M., but ten minutes into the visit, H.M. would be begging the mother to play with her as the mother became more concerned with spending time with the other adults present for the visit. |4Carol Dean, the OCS case manager, testified that the mother was not emotionally connected with H.M. during these visits, and that it was usually H.M. who engaged her mother by bringing gifts and asking her mother about what had been happening in her life.
In order for the mother to gain a better understanding of the alleged sex abuse of H.M. and its effects, the case plan directed the mother to: (i) live apart from the *413 alleged perpetrator until he participated in and completed a sexual perpetrator treatment program, received favorable report from his therapist, and OCS perceived that H.M. would be safe; (ii) participate in counseling and demonstrate that she had an understanding of the effects of sex abuse on H.M.; (iii) not have contact or involvement with any person alleged to have harmed H.M. or with a history of inappropriate behavior; (iv) not blame H.M. for the abuse; and (v) support H.M. in her statements about being abused. In order to maintain a family bond, the mother was ordered not to talk to H.M. concerning the incident that brought her into foster care.
The alleged sex abuse by Raymond Ray was the main reason that H.M. was removed from her mother’s home, yet not only did the mother not follow the directives of the case plan that dealt with this issue, but she actually took actions which worsened the situation. It did not take long after removal for the mother to demonstrate which relationship she considered to be the more important to her.
lfiRay and the mother were married on May 15. Ray was arrested on May 21 and charged with aggravated sexual assault of H.M. Ray returned to the mother’s home on October 14 after he was released on bail.
The CASA report from October 30, which was filed into evidence, detailed an event that occurred on October 15. The mother had called the Tuckers’ home and left a message for H.M. to call her at home. When H.M. returned the call, Ray answered the phone. The mother told H.M. that Ray had gotten out of jail because she had lied. The Tuckers subsequently obtained a protective order preventing Ray from having contact with H.M.
The CASA report also noted that each time the caseworker had visited with the mother, the mother’s only concern was that Ray was being falsely accused. When the caseworker attempted to discuss H.M.’s situation with the mother, she redirected the conversation back to Ray. Notably, the mother had contacted CASA concerning only the loss of H.M.’s Social Security income.
It is apparent that the mother remains committed to maintaining her belief in the innocence of Ray to the detriment of her daughter. The mother’s preremoval actions are nearly as mind-boggling. The CASA caseworker reported that the mother had told her that she had witnessed Lucky Bridges touch and harass H.M., but she did not report it because she was fearful of losing H.M.
The father has been more committed to complying with the case plan for the benefit of his daughter. His goals under the case plan were to demonstrate positive parenting skills, maintain a bond with H.M., cooperate |fiwith OCS, and have a permanent plan with H.M. The OCS report, also filed into evidence, stated that the father wanted custody of H.M., worked with OCS by participating in DNA testing, visited H.M. regularly and frequently communicated with her over the phone, and showed an interest in H.M.’s overall development.
Based upon our review of this record, we cannot conclude that the trial court was clearly wrong in permanently placing H.M. with her father.
The mother also complains about lack of notice of the permanency hearing. La. Ch. C. art. 703 states:
Written notice of the date, time, and place of the dispositional hearing shall be served and a return made in the same manner as a petition on all parties *414 and counsel of record at least fifteen days prior to the hearing, unless the parties have been previously notified in open court at a prior hearing.
Although the hearing was originally set as a case review hearing, the mother cannot argue that she was prejudiced by a lack of notice that the State would seek to place legal custody with the father. First, the case plan assessment stated that the father wanted custody of H.M. and that a home study was being done on him for placement. Thus, the mother should have been aware that the granting of custody to the father would be an issue at some point in the proceedings. Second, the OCS report recommending that custody be vacated to the father was written on October 20 and filed into the record on October 24, well in advance of the scheduled November 3 hearing. The statement of fees submitted by the mother’s counsel reflects that he received and reviewed an OCS report on October 20; presumably 17this is the OCS report from October 20. The mother’s argument concerning lack of notice is meritless.
The mother also contends that the court erred in permitting the permanent placement without requiring OCS to seek judicial determination that reunification efforts were not required under La. Ch. C. art. 672.1.
Article 672.1 is permissive, and not mandatory, as it provides that the Department “may” file a motion for a judicial determination that efforts to reunify the parent and child are not required. See State ex rel. C.M. v. Willis, 41,908 (La. App. 2d Cir.12/27/06), 946 So.2d 316, writ denied, 2007-0190 (La.2/16/07), 949 So.2d 413.
Carol Dean testified that OCS was asking not to be required to make any further reunification efforts. However, DSS was not seeking a judicial determination that reunification efforts were no longer required. Rather, DSS was seeking a permanent placement with the father, which would remove the requirement that DSS make reasonable efforts to reunify the mother and daughter.
Except in the extraordinary circumstances set forth in art. 672.1, the State must undertake reasonable efforts to assist the parent in removing the obstacles to reunification. State ex rel. A.T., 2006-0501 (La.7/6/06), 936 So.2d 79. At least as long as the child’s permanent plan is reunification, in accordance with that plan, the State has the duty to make reasonable efforts to reunify the parent and child. Id.
The State reunified the parent and child, albeit not the parent from whom the child was removed, when custody was returned to the father. The |8State’s goal was no longer reunification with the mother and, as such, the State did not continue to have an obligation to assist the mother in removing the obstacles to reunifying her with H.M. We recognize that the largest obstacle to reunification for the mother was her decision to marry the man accused of sexually abusing her daughter, then opening her home to him after he was bailed out of jail following his arrest. These were choices made by the mother after removal. This action is not a termination of parental rights, so the mother still has time to make the right choices that show she places her daughter’s well-being above her own. The mother’s argument that the State was required to seek an art. 672.1 judicial determination is without merit.
DECREE
With costs of this appeal to be paid by the mother, the judgment is AFFIRMED.

. Unless stated otherwise, all dates are for the year 2008.

. H.M. also reported that Lucky Bridges, another male friend of her mother, had once climbed into bed with her while clad only in his underwear.

. The mother had been required to undergo a psychological assessment and follow all recommendations given by the psychologist. The evaluation was cancelled and never rescheduled by OCS.

. The parenting classes were scheduled to begin in October and were to last 12 weeks.